**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 95-40692**
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

MARCOS ANTONIO SALINAS-GRIMALDO,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Southern District of Texas
(M-94-CR-212-02)
_____
November 20, 1997

Before REYNALDO G. GARZA, KING, and BENAVIDES, CIRCUIT JUDGES

PER CURIAM:[1]

This is an appeal from a decision of the United States
District Court for the Southern District of Texas, Judge Ricardo
Hinojosa, presiding.  In this case, the Defendant-Appellant,
Marcos Antonio Salinas-Grimaldo ("Salinas"), was convicted on a
charge of conspiracy to possess 150 kilos of marijuana, with
intent to distribute.  Upon review of the oral arguments,
pleadings, briefs, and record on file, we AFFIRM the decision of

---

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the district court.

## Background

Defendant-Appellant Salinas was indicted on November 8, 1994, in the McAllen Division of the Southern District of Texas, in a 3 count indictment. His brother, Luis Salinas ("Luis") and Jose Botello ("Botello") were also included in this indictment. Count 1 charged the defendants with conspiring to possess 4 kilos of cocaine with intent to distribute. Count 2 charged them with conspiring to possess 150 kilos of marijuana, with intent to distribute. Count 3 charged them with possessing 44 kilos of marijuana with intent to distribute. Luis and Botello made plea agreements, and pled guilty to some of the charges against them. Salinas went to trial. At that trial, Salinas moved for a judgment of acquittal on all counts. Judge Ricardo Hinojosa granted the motion as to counts 1 and 3. The case went to the jury, and on February 21, 1995, after only a few hours of deliberation, Salinas was convicted on count 2. On August 10, 1995, Judge Hinojosa sentenced Salinas to 41 months in prison, to be followed by a three-year term of supervised release, and a $50 special assessment.

Luis Salinas, brother of the Defendant-Appellant, was arrested in May of 1994, when he was found in possession of 694 pounds of marijuana, after an investigation by the DEA, in which

Agent Marvin Winham ("Agent Winham") was a participant. After this arrest, Luis was held in the Hidalgo and Starr County jails. However, Luis, a persistent fellow, still continued to manage his drug operations from the jailhouse.

Agent Winham continued his investigation of Luis. He joined with other members of the DEA and Agents Johnny Murad ("Agent Murad") and Joey Davidson ("Agent Davidson"), officers of the Lincoln Parish Sheriff's Department in Louisiana, to organize a joint investigation and sting against Luis. A fictitious character, "Johnny Davidson," was created by the undercover operatives in this sting, and Agent Winham instructed a jailhouse informant, David Recio ("Recio"), to tell Luis that Johnny Davidson was a ready buyer of drugs in Louisiana, and would accept collect calls from Luis.

On September 22, 1994, Agents Murad and Davidson received a package addressed to "John Davidson," containing 44 kilos of marijuana hidden inside an air compressor. The shipment was arranged by Luis Salinas. The payment for this marijuana was $55,000, $46,000 of which was payable in cash, and the balance with the title for a 1988 Ford pickup truck. The first payment of this was a $1500 payment to be given to a woman later to be known as "Ana," who was said to be Luis' wife. On September 30, 1994, Agent Tony Santos ("Agent Santos") gave the money to the woman in the parking lot of a McAllen store. The woman sped off before Agent Santos could speak with her. No one has ever quite

3

figured out who Ana was, or what happened to the $1500.

Over the following weeks, Luis and the agents had various conversations regarding payment of the balance for the previous transaction, and plans for future dealings. Various negotiations ensued for further shipments. During these conversations, plans for shipment of 119 pounds of marijuana and 3 to 4 kilos of cocaine were made. A meeting was arranged between the agents and associates of Luis at the Doubletree Hotel in McAllen, a location the agents had staked out, for October 25, 1994.

On that date, Luis called the agents at the Doubletree. He said he was having problems finding someone to pick up the money, and that someone would be there in a couple of hours. About 30 minutes after that call, Botello showed up at the appointed room. Botello had consumed a few quarts of beer, and appeared intoxicated to the agents. Botello and the agents discussed payment for the original transaction, and plans for the cocaine deal. When the money was given to Botello, agents in the next room, who were monitoring the meeting on video, burst in and arrested him.

Shortly after Botello's arrest, Agent Murad told Luis that he had spoken to one of his men in McAllen, and that this man had given the money to someone named "Joe" who had come to the hotel room. Luis said he'd sent his friend "Marcos" to get the money. This was the first and only mention of a "Marcos" in some 15 to 20 conversations Agent Murad had with Luis over several weeks.

4

Luis asked if the money had been picked up, and he was told that it was.

During this time, surveillance agents were monitoring the Doubletree Hotel. These agents observed Botello walk from nearby Archer Park to the Doubletree, and they attempted to locate the vehicle in which he arrived. Officer Art Lopez ("Officer Lopez") noticed a red Cougar which had been seen in two different locations. He saw it park, a man get inside of it, and then proceed south towards the city of Mission, Texas. The car was stopped, and the passengers were the Defendant-Appellant Salinas, his wife, and their child. A DEA agent who arrived to assist noticed that Salinas was the same suspicious person he noticed standing by a park bench in Archer Park at the time of Botello's arrest.

Upon questioning, Salinas acknowledged that Luis was his brother, and that he had given Botello a ride to McAllen. Salinas was asked what he was doing in Archer Park, and he replied that he was at the park walking for exercise. The officers noticed that he was wearing sandals, and questioned his choice of exercise footwear. Salinas said he always wore sandals, including when walking for exercise. He was then arrested.

Botello testified at the trial that on the date in question he went to an auto shop where he saw his friend Salinas. He said Salinas asked him to help bring a broken-down car to the shop,

5

and Botello agreed.  Botello says that on the way to McAllen, the plans changed.  Salinas said they were going to the Doubletree Hotel, and that he wanted Botello to get $46,500 from a man named "Chris" ("Chris" was the undercover name of one of the operatives).  Salinas repeated these instructions as Botello drank his quarts of beer.  Salinas also reportedly told Botello to say that Luis sent him, and that Botello would get $200-300 for this.

Botello testified that he never met Luis, and that he never asked Salinas why he was being asked to get the money.  He did say that because of the amount of money involved, he figured it was for marijuana, though he never asked.  The government states in its brief that he seemed knowledgeable about the details of the marijuana and cocaine deliveries in the videotaped meeting with the undercover agents at the Doubletree.  Botello testified that when they arrived in McAllen, they stopped at Archer Park, where Salinas repeated the instructions.  Botello then went to the room, and as stated previously, was arrested.

### Standard of Review and Elements of Proof

The standard for review for reviewing the sufficiency of evidence supporting a jury's verdict in this Circuit is as follows:

> In our review of the sufficiency of the evidence
> supporting a jury's verdict, we determine whether,

6

> viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt. We recognize that the jury was free to choose among all reasonable constructions of the evidence, and accept all credibility choices that tend to support the jury's verdict. We view the evidence, though direct and circumstantial, as well as all reasonable inferences from that evidence, in the light most favorable to the verdict. Moreover, we determine only whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence. However, we must reverse a conviction if evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged.

*United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995)(citations and quotation marks omitted), *cert. denied*, 116 S.Ct. 748 (1996); *see also U.S. v. Broussard*, 80 F.3d 1025, 1030-1031 (5th Cir. 1996), *cert. denied*, 117 S.Ct. 264 (1996); *U.S. v. Jamarillo*, 42 F.3d 920, 922-923 (1994), *cert. denied,* 514 U.S. 1134 (1995).

The elements of a drug conspiracy are: (1) the existence of an agreement between two or more persons to violate narcotics law; (2) the defendant's knowledge of the agreement; (3) the defendant's voluntary participation in the agreement. *U.S. v. Pena-Rodriguez*, 110 F.3d 1120, 1122 (5th Cir. 1997), *cert. denied*, WL 562076 (1997); *see also U.S. v. Gonzalez*, 76 F.3d 1339, 1346 (5th Cir. 1996). Mere presence at a crime scene is not enough alone to support an inference of participation in a conspiracy, but presence is one factor the jury may rely on.

7

*U.S. v. Maltos*, 985 F.2d 743, 747 (5th Cir. 1992).  On a related note, while a conviction cannot be based solely on the existence of a familial relationship between the defendant and a criminal, inferences from such a fact may be combined with other circumstantial evidence to support a conspiracy conviction. *Broussard*, 80 F.3d at 1031.  Also, because secrecy is the norm in an illicit conspiracy, the elements of the offense may be proven by circumstantial evidence.  *U.S. v. Greenwood*, 974 F.2d 1449, 1457 (5th Cir. 1992).  However, the court will not lightly infer a defendant's knowledge or participation in a conspiracy, and the government may not prove up a conspiracy merely by placing the defendant in "a climate of activity that reeks of something foul."  *Maltos*, 985 U.S. at 746.

Further, one may be guilty as a co-conspirator even if he plays a minor role, and that person need not know all the details of the illicit enterprise.  *Greenwood*, 974 F.2d at 1457.  An explicit agreement to join the conspiracy is not needed, tacit agreement will suffice.  *Id*.  Also, so long as it is not facially insubstantial or incredible, the uncooborated testimony of a co-conspirator, even one who has chosen to cooperate with the prosecution in return for leniency, may be constitutionally sufficient evidence to convict.  *Id*.  Testimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not

8

have occurred under the laws of nature. *Pena-Rodriguez*, 110 F.3d at 1123; *see also U.S. v. Bermea*, 30 F.3d 1539, 1552 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 1825 (1995).

## Discussion and Analysis

It was rational for the jury to convict Salinas. While it is true that guilt-by-association is not an acceptable reason for conviction, the prosecution had far more evidence than a "mere presence" argument. The jury apparently believed that it was more than just a coincidence that: (1) Salinas (by his own admission) drove Botello to a hotel, (2) where a known drug dealer (Salinas' brother) had arranged a meeting between a minion named "Marcos" (Salinas' first name) and undercover agents who were posing as drug dealers, (3) that Salinas told Botello (according to Botello's testimony, which is not incredible as a matter of law) all along the way that he was to retrieve a large sum of money (which Botello thought to be consistent with a drug deal), and (4) that it was no coincidence that these people and events crossed paths with each other in space and time at the Doubletree Hotel in McAllen.

On the issue of the sum of money and Botello's involvement, this Circuit has previously held that "drug traffickers are unlikely to entrust a large portion of the proceeds from their illicit trade to an outsider, especially when the outsider is

9

aware of the valuable nature of the merchandise he is carrying." *U.S. v. Gallo*, 927 F.2d 815, 821 (5th Cir. 1991). Further, regarding the use of Botello as a courier, this Circuit has held that the payment of a large sum of money for a simple errand may be considered suspicious. *U.S. v. Quiroz-Hernandez*, 48 F.3d 858, 865 (5th Cir. 1995); *U.S. v. Martinez-Mercado*, 888 F.2d 1484, 1491 (5th Cir. 1989). Also, the recruitment of another to do an illegal act does not relieve the recruiter from criminal liability. *U.S. v. Gonzalez-Rodriguez*, 966 F.2d 918, 921 (5th Cir. 1992). It would be a reasonable inference for the jury to think that Salinas did not want to take the risk of retrieving the drug money himself, so he brought Botello along. While any of these things alone would not have been enough to convict Salinas, the weight of the events, all stacked together, would allow a reasonable jury to convict him, and such inferences pass muster under the precedents set by this Circuit.

As previously stated, under the standard of review of this Circuit, we are to affirm the decision of the jury as long as it is rational. The only caveat is if the evidence gives equal or near-equal evidence of innocence. The evidence does not do so in this case. The alternate story is that Salinas was simply going for a walk in Archer Park, by chance gave Botello a ride to where a drug deal (arranged, again by chance, by Salinas' brother) was going on, which Salinas was unaware of, and that Botello was

10

lying about their conversation they had on the ride to McAllen. This seems far less credible than the story supporting conviction, and does not rise to the level of equal or near-equal evidence of innocence.  Therefore, we will not disturb the verdict of the jury or the sentence imposed.

## Conclusion

The prosecution met its burden in providing evidence linking Salinas to the drug conspiracy.  The jury's decision was rational, and was not based on improper inferences or prejudices. Therefore, the decision of the district court and the conviction of Salinas is AFFIRMED.

AFFIRMED.

11